**Rodney Howard WRIGHT**

v.

**TENNESSEE PEACE OFFICER STANDARDS AND TRAINING COMMISSION.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Assigned on Briefs Dec. 5, 2007.

April 29, 2008.

Permission to Appeal Denied by Supreme Court Dec. 8, 2008.

Shannon A. Jones, Alamo, Tennessee, for the appellant, Rodney Howard Wright.

Robert E. Cooper, Jr., Attorney General and Reporter, and Michael B. Leftwich, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Peace Officer Standards and Training Commission.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

Former police officer Rodney Howard Wright ("Wright") challenges the decision by the Tennessee Peace Officer Standards and Training Commission ("the POST Commission" or "the commission") decertifying him on the basis of his guilty plea in a domestic violence case that—after his plea was entered— dismissed and expunged. Wright contends that the POST Commission's reliance on his guilty plea as the basis for his decertification violates his rights under the judicial diversion statute. We agree. Accordingly, we reverse.

### I.

Tenn.Code Ann. § 38–8–106(4) (2006) states that "[a]ny person employed as a full-time police officer ... shall ... [n]ot have been convicted of or pleaded guilty to or entered a plea of nolo contendere to any felony charge or to any violation of any federal or state laws or city ordinances relating to force, violence, theft, dishonesty, gambling, liquor or controlled substances[.]" It is illegal for a police department to knowingly employ an officer who does not satisfy this requirement. Tenn. Code Ann. § 38–8–105(b) (2006). However, authority is vested in the POST Commission to "establish criteria for determining whether to grant an exception to or waive the qualifications of minimum stan-

dards as provided in § 38–8–106[.]" Tenn. Code Ann. § 38–8–104(d) (2006). If a waiver is granted, then a police department may employ an officer who would otherwise be in violation of § 38–8–106.

In practice—at least as demonstrated by the facts of this case [1]—waivers are granted through the "certification" process. Police officers are "required to be certified" by the POST Commission. Tenn. Comp. R. & Regs., ch. 1110–2–.01. An "Application for Certification" must be submitted to the POST Commission "not later than the end of the first day on which [the individual's] employment as a law enforcement officer commences." Tenn. Comp. R. & Regs., ch. 1110–5–.01(1). Apparently, a new application must be submitted for each new job—that is to say, the certification apparently does not "follow" the officer from one police department to another.[2]

Wright began his law enforcement career in October 1995, at age 21. He worked for the Rutherford County Police Department until July 1998. He was not certified during that time. In October 1998, he began working for the Newbern Police Department. That department submitted an application for certification on Wright's behalf three weeks before his employment began. Wright subsequently completed POST Academy training, and on December 17, 1998, approximately two months after his start date at Newbern, the POST Commission certified Wright.

On July 30, 1999, Wright was charged with aggravated assault in connection with a domestic incident between him and his then-wife. The full record of that proceeding is not before us. However, years later, Wright would testify before the POST Commission that he did not strike his wife, but rather that she struck him. He admitted there was a "shoving match," and that he "used a pressure point technique to try to gain control over her and … make her stop fighting me…. [I] said, quit kicking, quit fighting, stop this[.]" He added, "[t]hat's exactly what I told the judge I did." Wright resigned from the Newbern Police Department four days after the charge was filed.

On the advice of counsel, Wright pleaded guilty to simple assault because, accord-

---

1. The POST Commission rules seem to imply that there is, or should be, a separate process for waiver requests, independent of the certification process. Tenn. Comp. R. & Regs., ch., ch. 1110–9–.01. Moreover, if the language of the rules and the text of the "Application for Certification" form are read literally, they suggest that certification should not be requested until a waiver has *already* been both requested and granted. However, the actions of the POST Commission in the instant case, as reflected in this record, appear to indicate that this distinction is not rigidly observed in practice. There is nothing in this record relating to any "request for waiver" as such. Rather, a "waiver" was initially granted in response to an "Application for Certification," and then a "waiver" was subsequently denied (or revoked) in the course of a "decertification" hearing. As will be seen, our holding pretermits the question of whether the proper procedures were followed in this case.

2. We have found no direct statutory or regulatory authority making this point clear, but Tenn. Comp. R. & Regs., ch. 1110–5–.01 does distinguish between the general category of "officers required to be certified," who must submit the standard paperwork, and the more specific subcategory of "newly employed uncertified officers," who must submit the standard paperwork *plus* an "application for the Basic Law Enforcement School." The fact that, apparently, *some* "officers required to be certified" are *not* "newly employed uncertified officers" seems to imply that even previously certified officers must be *re*-certified for each new job. Both parties in the instant case appear to be operating on this assumption throughout the proceedings below and before this court, and each department that Wright worked for after his initial certification did in fact submit a new application for certification on his behalf (albeit not always in a timely fashion).

ing to him, he wanted to avoid the risk of a jury trial. He entered this plea on September 18, 2000, and was placed on judicial diversion. The court's order states, in pertinent part, as follows:

> It appears to the Court that the defendant, RODNEY WRIGHT, has entered a plea of guilty to the offense of Assault as mentioned above, and that the parties hereto agree that *an adjudication of guilt should be withheld* and further proceedings in this cause deferred under the provisions of T.C.A. Section 40–35–313, pending completion by defendant of a period of supervised probation for 11 months and 29 days and to attend behavioral counseling. Defendant is to pay a fine of $500.00; complete 50 hours of community service; and pay probation fee of $25.00 per month. Fine is to be paid at $50.00 per month.
>
> * * *
>
> Provided defendant successfully completes the period of probation without a violation of any of the conditions thereof, said defendant will be discharged and *this cause will be dismissed.*

(Emphasis added.) The diversion statute referenced in the order declares that such a "discharge or dismissal *shall not be deemed a conviction* for purposes of disqualifications or disabilities imposed by law upon conviction of a crime *or for any other purpose,* except as provided [in exceptions not pertinent to the instant case]." Tenn.Code Ann. § 40–35–313(a)(2) (Supp.

2007) (emphasis added). In addition, once the discharge and dismissal has occurred, the accused may apply to have his or her record expunged of the charges in question, and, upon such application, he or she is entitled to expungement as a matter of right. Tenn.Code Ann. § 40–35–313(b).

Wright's probationary period expired on September 17, 2001, and the assault charge was dismissed on December 18, 2001. Wright apparently did not immediately apply to have his record expunged. Nevertheless, in accordance with the terms of the diversion statute and the wording of the court's order, Wright was *never convicted* of assault, even though he had pleaded guilty.

On December 12, 2001, six days before the formal dismissal of the assault charges, Wright began work as a police officer again, this time for the Troy Police Department. On February 3, 2002, the department submitted a new application for certification to the POST Commission on Wright's behalf.[3] The application was stamped as received on February 13, 2002. Subsequently, the Tennessee Bureau of Investigation ("TBI") ran a criminal history check on Wright, which revealed four separate charges, some of them duplicative and all of them related to the 1999 incident. The background check listed the disposition of all four charges as "unknown," although the assault case had in fact been dismissed several months earli-

---

**3.** If, as appears to be the case (see note 2, *supra*), a new application for certification is required for each new job—*i.e.,* if Troy was not entitled to rely on Wright's prior certification—then this application was roughly two-and-a-half-months late under Tenn. Comp. R. & Regs., ch. 1110–5–.01(1), which requires that the application be submitted "not later than the end of the first day on which [the individual's] employment as a law enforcement officer commences." The reason for

the delay is not clear from the record. Wright testified before the POST Commission that the application was submitted "to make my certification active so I would be eligible for in-service pay." The trial court found that Troy submitted the application because it "had to request that the POST Commission waive the federal requirement that prohibited anyone *convicted of domestic violence from* possessing a firearm."

er.[4] This information was stamped as received by the POST Commission on March 27, 2002. A hearing was scheduled for May 10, 2002, to address the matter of Wright's application for certification in light of his criminal history. The transcript of that hearing is not in this record, but a letter sent to the Troy P.D. on May 17, 2002, indicates that the commission "voted to approve the request for a waiver" and "[i]t will be so noted in his file that a waiver has been granted." [5]

Wright left the Troy Police Department and re-joined the Newbern Police Department in September 2002. On his first day of work at Newbern P.D., September 18, 2002, yet another application for certification was submitted on his behalf. On this application, in response to questions asking if he had been "convicted" of any crimes, Wright circled "yes," put a question mark on the "no" line, and wrote "see attached letter." Wright *could* have truthfully answered "no," as he was in fact never "convicted" of any crime, and the application does not specifically ask about

guilty pleas.[6] He chose, however, to bring the previously-waived guilty plea to the commission's attention by attaching the commission's above-mentioned May 17, 2002, letter. The application was stamped as received by the POST Commission on September 30, 2002.

Approximately two months after the commission's receipt of the latest application, another criminal background check was done, again indicating that Wright had four arrests with "unknown" dispositions, including the dropped aggravated assault charge and the dismissed assault charge to which Wright had pleaded guilty under the diversion program. Written on the first page of the criminal history report are the words "POST Waiver granted on all charges 5/10/02"; it is unclear if those words were written by an employee of the TBI, the Newbern Police Department, or the POST Commission. The report was stamped as received by the POST Commission on December 3, 2002.

The record indicates that, aside from receiving the TBI's criminal history report,

---

4.  In his testimony before the POST Commission, Wright stated that the delay in getting the charges dismissed was the result of inaction by the office of the trial court clerk.

5.  Intriguingly, the agenda for the May 10, 2002, meeting states that Wright's criminal background check "indicate[s] *several charges* from 1999 and 2000" (emphasis added); it says nothing about any convictions, guilty pleas, or pleas of nolo contendere, which are the operative standard for disqualification under Tenn.Code Ann. § 38-8-106. Furthermore, the commission's May 17, 2002, letter lists all four charges that were discovered by the TBI background check, including the original aggravated assault charge that was dropped when Wright pleaded guilty to simple assault, and states that the commission granted "a waiver for the *above charges.*" (Emphasis added.) Of course, a waiver is not necessary for mere "charges"; only the simple assault charge to which Wright pleaded guilty even arguably required a waiver. The letter does not make this distinction, however.

6.  The application does contain a printed paragraph mirroring the text of the statute, including the "guilty plea" language, but it is unclear what the purpose of this paragraph is. It is not immediately followed either by a signature line or by an opportunity to check "yes" or "no." Arguably, an applicant asserts that he is qualified in accordance with the quoted statutory text-including the language relating to guilty pleas-simply by signing his name on the application's signature line, six paragraphs down. If this is the case, however, then the specific questions about "convictions" seemingly serve no purpose, and an applicant with a conviction would contradict himself merely by signing the application, regardless of his answers to those questions. Another possible interpretation of the form's wording is that its drafters simply were not cognizant of the distinction between "convictions" and "guilty pleas" that is now central to the commission's case.

the commission took no action in Wright's case for almost a year after receiving his application for certification in September 2002.[7] Moreover, it appears that the commission *never* responded to the application for certification as such. Instead, when the POST Commission, made up largely of newly-appointed members, finally took up Wright's case again in August 2003, it did so by instituting proceedings to *de*-certify him—not proceedings to either grant or deny *re*-certification, which is what the September 2002 application had requested. The commission's letter to Wright on August 25, 2003, stated as follows:

> It was the decision of the Commission at the August 15, 2003 meeting to begin the proceedings to *decertify* you. According to POST Rule 1110–2–.04(4) and T.C.A. Code 38–8–104 and 38–8–105, you are hereby notified that proceedings to *revoke your certification* have been instituted in accordance with these rules. You have thirty (30) days from the receipt of this letter to request an appeal of this action. Failure to contact the Commission within thirty (30) days to request a hearing will result in automatic *revocation* of your certification.

(Emphasis added.) As can be seen, the commission's own language suggests that it was not actually responding to the new application for certification that had been submitted on Wright's behalf eleven months earlier, but rather was treating Wright's *earlier* certification as still valid and declaring its intention to "revoke" *that* certification, and thus "decertify" Wright. This appears to conflict with the aforemen-

tioned concept that certifications and waivers purportedly do not "travel" with an officer from job to job.[8] Moreover, it is highly unusual that the POST Commission would seek to "decertify" Wright on the basis of a guilty plea that *pre-dated his prior certification* (and that was, indeed, considered and waived in the course of that earlier certification), given that the cited rule governing decertification, Tenn. Comp. R. & Regs., ch. 1110–2–.04(2)(a), relates only to events that occur "subsequent to certification." Needless to say, we have grave doubts about the propriety of this procedure. However, Wright does not raise this issue on appeal, and we rule in his favor on other grounds, so we need not decide this point.

In any event, the Newbern Police Department suspended Wright on September 5, 2003, due to the pending decertification proceedings. Six days later, Wright obtained an order of expungement from the trial court in the assault case. As noted earlier, he had been legally entitled to expungement upon request ever since the case was dismissed on December 18, 2001, but he evidently had not applied for it. The threatened decertification apparently spurred him to do so, and his record was finally expunged on September 11, 2003. He then requested a hearing before the POST Commission to contest his decertification. A hearing was scheduled for October 17, 2003. The commission's agenda states, in pertinent part, as follows:

WRIGHT, RODNEY HOWARD— NEWBERN PD

---

7. By contrast, approximately two-and-a-half months passed between Wright's initial application and certification in 1998, and just over three months passed between his second application and certification (with waiver) earlier in 2002.

8. As stated earlier, we have found no direct authority for this proposition, but both parties appear to assume it is true. However, if Wright's prior certification expired automatically when he changed jobs in September 2002, then presumably there would have been nothing for the commission to "revoke" in August 2003.

Appealing the Decertification which began at the August 15, 2003 POST Commission Meeting when the POST Commission was made aware of the Assault Charge,[9] which was Domestic related. He has an order of Expungement dated 9–11–03, indicating that all charges were dismissed on Dec. 18, 2001. He was granted a waiver by the POST Commission on 5–10–02 at the request of the Troy PD. He has been with Newbern PD since 9–18–02 and was suspended ·from the department until this matter was settled.

(Capitalization in original; footnote added)

The commission examined the record and heard argument and testimony from Wright on October 17, 2003. The transcript of the meeting shows considerable confusion and some disagreement among the commissioners about the legal significance of judicial diversion and of expungement, as well as a general lack of clarity about the procedural posture of the case before the commission. In the end, however, the commissioners concluded that, under their rules, they were obligated to find Wright in violation of Tenn.Code Ann. § 38–8–106 because of his guilty plea— despite the lack of a conviction, and despite the subsequent expungement—but also concluded that they had discretion to grant him a waiver of that violation, if they so chose. They chose not to do so, however, voting 9 to 4 against a "motion that we reaffirm the prior waiver that was given in this case and allow this person to be certi-

fied." That motion was followed by an affirmative "motion ... to decertify," which carried by a voice vote. Wright then sought clarification over whether his "waiver has been withdrawn," which he was told it had. This was confirmed in a letter to Wright ten days later, which states in part:

> It was the decision of the POST Commission to deny the waiver granted for the Aggravated Assault charges[10] in May 2002, since they were domestic related. It was also the decision of the POST Commission for final decertification. It will be noted on all records pertaining to you, that you are no longer certified to be a Police Officer in the State of Tennessee.

(Footnote added.)

As can be seen, the record is somewhat unclear as to whether the POST Commission was revoking a prior waiver or denying a new one, a confusion which generally parallels the above-mentioned issue of certification versus decertification. The precise grounds for the revocation (or denial) are also not stated clearly or consistently. Nevertheless, procedural errors and imprecisions notwithstanding, the effect of the commission's action is clear: Wright is no longer certified to be a police officer. He was fired by the Newbern Police Department on October 27, 2003, on account of his decertification. He filed a "petition for judicial review" on December 16, 2003. The trial court heard argument of counsel

---

9. Again, we note that an "Assault Charge" is not a proper ground for disqualification. However, it is clear from the transcript of the commission's meeting that the commissioners' actual focus was on his guilty plea and the various issues discussed herein related to that plea. The imprecise language of their agendas and letters notwithstanding, the commission rightly did not view the mere fact of the "charge" as sufficient grounds for decertifying Wright.

10. Yet again, we note that "the Aggravated Assault charges" do not constitute a proper ground for any action by the commission, since they are merely *charges* and do not represent the crime for which Wright pleaded guilty, which was simple assault. However, again, it does not appear that the commission actually acted on this stated basis.

on October 8, 2004, and, after reviewing the record and the briefs, entered an order on November 15, 2004, upholding the commission's decision. Wright timely appealed.

## II.

■■■ Wright's "petition for judicial review" did not state its jurisdictional basis, but the trial court described it as a petition for writ of certiorari, and both Wright and the POST Commission treat it as such in their briefs. "The scope of review under an action for writ of certiorari is narrow." *Blackmon v. Tennessee Bd. of Paroles,* 29 S.W.3d 875, 878 (Tenn.Ct.App.2000). "It covers only an inquiry into whether the Board has exceeded its jurisdiction or is acting illegally, fraudulently, or arbitrarily." *Powell v. Parole Eligibility Review Bd.,* 879 S.W.2d 871, 873 (Tenn.Ct.App. 1994). "Reversal or modification of the [administrative board's] action may be had only when the trial court determines that the Board acted in violation of constitutional and statutory provisions, exceeded its own statutory authority, followed an unlawful procedure, acted arbitrarily or capriciously, or reached a decision without any material evidence to support it." *Massey v. Shelby County Retirement Bd.,* 813 S.W.2d 462, 464 (Tenn.Ct.App.1991).

If, alternatively, Wright's petition were to be treated as seeking judicial review under the Uniform Administrative Procedures Act ("UAPA"), codified at Tenn. Code Ann. § 4–5–322 (2005), the standard would be essentially the same. Indeed, the UAPA language is virtually identical to the language in *Massey.* The key point, for purposes of this case, is that the ruling will be overturned if it violated or exceeded the commission's statutory authority.

■■■ On appeal, "[w]e use the same standard to review administrative decisions that trial courts use." *Ware v.*

*Greene,* 984 S.W.2d 610, 614 (Tenn.Ct.App. 1998). *See also CF Industries v. Tennessee Public Service Commission,* 599 S.W.2d 536, 540 (Tenn.1980) (appellate courts use "same standard" as trial courts in UAPA cases as well).

## III.

### A.

■■ As an initial matter, we emphasize that, to the extent that any action in this case was based upon the premise that Wright was *convicted* of any crime, that action was clearly in error, irrespective of expungement. Thus, for instance, the POST Commission's reference in its supplemental brief to "convictions that have been subjected to judicial diversion" is a non-sequitur. As we noted earlier, the diversion statute states unambiguously that "[t]he discharge or dismissal *shall not be deemed a conviction* for purposes of disqualifications or disabilities imposed by law upon conviction of a crime *or for any other purpose,*" with several listed exceptions that are unrelated to the facts of this case. Tenn.Code Ann. § 40–35–313(a)(2) (emphasis added).

■■ It appears from the administrative record that, in its decision, the POST Commission relied upon Wright's guilty plea, rather than on any purported "conviction," as its basis for decertifying him. Certainly, the guilty plea was the trial court's sole basis for upholding the commission's ruling. However, the commission advances the "conviction" argument on appeal, and we have also noticed in our review of the record that a number of state forms and other documents indicate or imply that a guilty plea under a judicial diversion program is tantamount to a "conviction." It is not. An individual who successfully completes a judicial diversion program under § 40–35–313 has *not* been "convicted" of

any crime, and cannot be treated as such for "any ... purpose" under the law, except those specified by statute, none of which apply here. *See State v. Tolbert,* No. E1999–02326–CCA–R3–CD, 2000 WL 1172344, \*3–4 (Tenn.Crim.App., filed August 18, 2000) (guilty plea followed by dismissal under judicial diversion statute is not a conviction; the person "was not convicted of any crime"). *Cf. State v. McCobb,* No. W2006–01517–CCA–R3–CD, 2007 WL 2822921, \*7 (Tenn.Crim.App., filed September 26, 2007) (guilty plea followed by initial judicial diversion order may be treated as analogous to "conviction" for sentencing purposes where the person committed another crime *while still in probationary period* created by diversion program; "non-entry of judgment of conviction depends upon successful completion of the diversionary period"). Accordingly, we reject the commission's argument on appeal that Wright's guilty plea should be treated as a "conviction."

However, as we have already stated, it appears from the transcript of the October 17, 2003, meeting that the commissioners decertified Wright because they concluded that his guilty plea was enough by itself, even without a "conviction," to disqualify him under the Tenn.Code Ann. § 38–8–106 requirement that "[a]ny person employed as a full-time police officer ... shall ... [n]ot have been convicted of or *pleaded guilty to* or entered a plea of nolo contendere to any ... violation of any federal or state laws ... relating to force [or] violence[.]" (Emphasis added.) They further concluded that, in Commissioner Sellick's words, his guilty plea "can't be expunged, in essence, for this Commission's purposes." Thus, the commission

decided that Wright was not qualified to be a police officer without a waiver, and that it was within the commission's discretion to either grant or deny him a waiver. Exercising this purported discretion, the commissioners voted to deny him a waiver.

It is worth noting that the commission's reasoning also appears to have been related to—although not squarely governed by—a pair of amendments to the POST Commission's administrative rules and regulations ("the POST rules") that took effect on August 28, 2002, which was *after* Wright's previous waiver and certification on May 10, 2002. The transcript reveals considerable discussion of the amendment that added "domestic violence convictions" to the list of "circumstances" in which "[a] waiver will not be granted for expungement." Tenn. Comp. R. & Regs., ch. 1110–9–.04(c). The commission appears to have correctly concluded that, since there was no "conviction" in Wright's case, that amendment did not apply. Strangely, however, the commission appears not to have even *considered* a simultaneous and related amendment, which excluded "domestic violence" from the list of "violation[s]" for which "[w]aivers may be granted if the officer has been convicted of or pleaded guilty to" the charges. Tenn. Comp. R. & Regs., ch. 1110–9–.04(b)(1).[11] Following the commission's own rationale, this more general rule change would have seemingly eliminated the commission's discretion to grant a waiver; the commissioners would have been, according to their own logic, *required* to decertify Wright. Yet the commission appears not to have taken any note of that amendment. Regardless, neither amendment settles the

---

11. No domestic violence-related provisions were added to the rule regarding decertification, Tenn. Comp. R. & Regs., ch. 1110–2–.04, nor to the "pre-employment requirements" that govern whether a waiver is needed in the first place. Tenn. Comp. R. & Regs., ch. 1110–2–.03; Tenn.Code Ann. § 38–8–106.

question that is central to this case: the impact of an expunged guilty plea. We mention the amendments only in the interest of completeness, and also because some commissioners appear to have been influenced by the general tenor of the rule changes—*i.e.*, their get-tough stance on domestic violence. Commissioner Wyatt, for instance, stated, "I just have to say that I think the law is if there's a domestic violence incident, a police officer can't be a police officer."

The pivotal issue in this case, however, remains the issue of the expunged plea. In support of the notion that the commission may—indeed, must—consider guilty pleas that have been expunged, both the commission and the trial court point to the POST rules, which clearly presuppose that expunged violations are still disqualifying offenses, absent a waiver. The rules regarding certification requirements state:

A person who has had misdemeanor charges expunged *may be considered* for certification. It is the responsibility of the officer and employing agency to present information and court documents relating to expungement to the Commission.

Tenn. Comp. R. & Regs., ch. 1110–2–.03(1)(e)(3) (emphasis added). Elaborating on this point, the rules detailing the criteria for waivers, in pertinent part, state as follows:

(c) Expungement of Charges—The Commission *may consider* a waiver from preemployment requirements relating to expungement of charges on an individual basis and depending on the circumstances.

1. A waiver *may be considered* for a person who has had misdemeanor charges expunged. It is the responsibility of the requesting agency to present information and court documentation re-

lating to the expungement to the Commission.

2. A waiver *will not be granted for expungement* in the event of the following circumstances:

(i) felony convictions,

(ii) narcotics violation that could result in a felony charge,

(iii) domestic violence convictions.

Tenn. Comp. R. & Regs., ch. 1110–9–.04(1)(c) (emphasis added). Given that the rules say the commission "may" consider a waiver in the event of expungement (except in certain situations), it follows logically that, according to these rules, expunged offenses are still disqualifying *unless* a waiver is granted. Otherwise, the above-quoted provisions would be meaningless.

However, the POST rules are only administrative regulations, not statutes. The statute governing preemployment qualifications, Tenn.Code Ann. § 38–8–106, is silent on the issue of whether expunged guilty pleas are to be considered as disqualifying offenses. Further, the general enabling statute that outlines the POST Commission's powers and duties, Tenn. Code Ann. § 38–8–104, does not authorize the commission to contravene other state statutes relating to expungement. We therefore turn to the dispositive issue in this case: whether the POST rules allowing for consideration of expunged violations contradict the statutory provisions relating to expungement in Tenn.Code Ann. § 40–35–313.

### B.

■ The judicial diversion statute declares that "[t]he effect of [an expungement] order is to restore the person, in the contemplation of the law, to the status the person occupied before the arrest or indictment or information." Tenn.Code Ann. § 40–35–313(b). Obviously, if some-

thing is "before the arrest or indictment or information," it is necessarily also *before any guilty plea.* Thus, according to the statute, the expungement of Wright's record on September 11, 2003, restored him to the legal status he occupied before he pleaded guilty to assault.

The statute directs the court entering an expungement order to send "a copy of the dismissal and expunction order to the Tennessee bureau of investigation for entry into its expunged criminal offender and pretrial diversion database." Tenn.Code Ann. § 40–35–313(d)(1). However, a separate statute that details the TBI's responsibilities in creating and maintaining that database states as follows: "Except for the purpose of certifying to judges and district attorney generals the information required in subsection (b) [*i.e.,* to ensure that no one is granted diversion twice], the expunged criminal offender and pretrial diversion database created by this section *is not a public record and shall be maintained as confidential by the bureau* [.]" Tenn.Code Ann. § 38–6–118(d) (2006) (emphasis added).

The judicial diversion statute further states: "No person as to whom the [expungement] order has been entered shall be held thereafter under any provision of any law to be guilty of perjury or otherwise giving a false statement by reason of the person's failures to recite or acknowledge the arrest, or indictment or information, or trial in response to any inquiry made of the person for any purpose [aside from an exception not pertinent to this case]." Tenn.Code Ann. § 40–35–313(b). In other words, Wright could have entirely refused to acknowledge the existence of the assault case in his testimony before the commission and in all documents submitted to the POST Commission after expungement, and yet he could not have been penalized for these omissions and false statements "under any provision of any law."

Despite this statutory language, both the trial court and the POST Commission advance a less expansive understanding of expungement's effect. They both quote language from the Supreme Court case of *State v. Schindler,* 986 S.W.2d 209, 211 (Tenn.1999), which states that "[e]xpungement does not return a person to the position occupied prior to committing the offense." However, we believe the trial court and the commission are both misinterpreting the thrust of *Schindler.*

There are several key points about *Schindler* that must be made at the outset. First, *Schindler's* interpretation of the § 40–35–313 expungement provision is arguably dicta, because the prior offenses at issue in that case were expunged in other states, under the terms of those states' diversion statutes—*not* under the terms of § 40–35–313. Secondly, the issue in *Schindler* was whether the defendant could be denied diversion in Tennessee on the basis of those prior diversions and expungements in other states. This issue would not even have been in controversy if the prior diversions had occurred in Tennessee under § 40–35–313, since the statute contains a clear and specific exception to expungement for the particular purpose of preventing the same individual from receiving judicial diversion twice in this state. Thus, although the court speaks in somewhat broad language about the admissibility of "public records compiled after the expungement that reveal the fact of a prior grant of diversion," it is important to recognize that these statements were made in the context of furthering a purpose that the legislature clearly intended— *i.e.,* preventing the same person from being granted multiple diversions—and also that the "public records" in question are *not* records of diversions under § 40–35–

313, but rather records of diversions under other states' statutes.

Nevertheless, *Schindler's* assertion that expungement under § 40–35–313 "does not return a person to the position occupied prior to committing the offense" is worth examining more closely. On a quick first reading, this language might seem almost to contradict the statute itself, which states that expungement "restore[s] the person, in the contemplation of the law, to the status the person occupied before the arrest or indictment or information." Yet a closer reading makes clear that there is in fact no contradiction. The relevant portion of *Schindler* reads more fully as follows:

> Expungement following successful completion of a judicial diversion program removes from certain official records recordation relating to the defendant's arrest, indictment, trial, finding of guilt, and dismissal and discharge. Tenn. Code Ann. § 40–35–313. Expungement returns the person to the position "occupied before such arrest or indictment or information." Tenn.Code Ann. § 40–35–313(b). Expungement does not return a person to the position occupied *prior to committing the offense.* Defendants obtaining expungement may have committed criminal acts resulting in lasting physical, emotional, or financial injuries to victims. In many cases, the injured victims cannot be returned to the status quo. Accordingly, the law would blind itself to reality if the law refused to

recognize these criminal *acts* and accord them any legal significance whatsoever.

> We hold that the testimony and evidence of *the criminal acts preceding the arrest* are admissible as evidence of prior bad acts or evidence of social history even if expungement is later obtained.

*Id.* at 211–12 (emphasis added). The crucial distinction is between the criminal acts themselves (in the instant case, the act of physical assault) and the *legal status* that results from the legal proceedings precipitated by that criminal act (in the instant case, a guilty plea followed by a dismissal). At most, *Schindler* stands only for the proposition that expungement does not erase a person's *underlying criminal conduct.* It does not stand for the much broader proposition that expungement allows continued resort to the person's resulting legal status as an independent ground for legal disqualifications, at least in contexts beyond the statutorily specified context of preventing the same individual from receiving multiple judicial diversions.

This crucial distinction was made even more explicit by another Supreme Court case later the same year, *State v. Lane,* 3 S.W.3d 456 (Tenn.1999), again dealing with the admissibility of a previous out-of-state conviction [12] that had been expunged under that state's diversion statute. In *Lane,* the context was a denial of alternative sentencing based in part on the prior expunged offense. The Court opined that, under Tenn.Code Ann. § 40–35–313(b),[13]

---

12. The Court in *Lane* uses the term "conviction" to describe the expunged out-of-state offense. Although we have noted repeatedly herein that guilty pleas followed by successful diversion under *this* state's judicial diversion statute are not properly described as "convictions," it is possible that the same may not be true of other states' diversion statutes. We have not considered this issue because it is not pertinent to our holding.

13. Again, the Court's interpretation of the Tenn.Code Ann. § 40–35–313 expungement provision is arguably dicta, since the offense in question was expunged under another state's diversion statute. However, *Lane* is at least as applicable as *Schindler,* which the trial court and the commission cite as authority for their position. Moreover, it should be noted that the Court in *Lane* specifically cites *Schindler* as authority for its reasoning on the expungement issue.

"expungement does not erase the underlying conduct or behavior," and therefore "the criminal acts underlying an expunged conviction may properly be considered[.]" *Id.* at 462. The Court went on to say: "To the extent that the trial court's decision in this case can be construed as dependent *on the mere fact of conviction (as compared to the underlying conduct)*, we find error in denying alternative sentencing on that basis." *Id.* (emphasis added). As in *Schindler,* the key point is the distinction between the underlying acts, which are not erased by expungement, and the legally operative facts resulting from those acts (such as "the mere fact of conviction," or in this case, the mere fact of a guilty plea), which *are* erased by expungement and cannot be considered. This conclusion is also entirely consistent with such cases as *State v. Williams,* 645 S.W.2d 258, 260 (Tenn.Crim.App.1982) (expunged offenses can be used to impeach a witness "by showing a prior *bad act* not amounting to a conviction") (emphasis added), and *State v. Dishman,* 915 S.W.2d 458, 463 (Tenn.Crim. App.1995) (same; dismissal under diversion statute "does not necessarily preclude the use of this *prior misconduct* as a means to impeach") (emphasis added).

The POST Commission argues that another Supreme Court case, *Canipe v. Memphis City Schools Bd. of Educ.,* 27 S.W.3d 919 (Tenn.2000), settled this issue in the commission's favor. *Canipe* explicitly states that its holding is consistent with *Schindler* and *Lane.* However, unlike *Lane* and *Schindler,* the facts of *Canipe* actually involve a prior diversion and expungement *in this state,* under the terms of Tenn.Code Ann. § 40–35–313. Specifically, the Court allowed a city school board to consider evidence of a teacher's expunged guilty plea under § 40–35–313 as a basis for firing the teacher. "[T]he Board relied upon information reported in a local newspaper that detailed [the teacher's]

plea of guilty and diversion agreement," as well as the teacher's admission to the school board's personnel director that she had pleaded guilty to sexual battery. *Id.* at 922. The Court noted that neither of these sources were an "official record" within the definition in the judicial diversion statute. The Court concluded "that [the teacher]'s admission that he had pleaded guilty to sexual battery properly could be considered by the Board at the hearing." *Id.*

*Canipe* is distinguishable from the instant case, however, because the ground for the teacher's dismissal was "conduct unbecoming a member of the teaching profession." *Id.* at 920. That is a criterion which may be implicated by the underlying *facts* of an alleged crime, as distinguished from the *legal proceedings* resulting from those underlying facts. As such, the evidence of the teacher's guilty plea was being used not necessarily to prove the existence of the plea itself, as a legally operative fact, but rather as evidence of the teacher's underlying conduct, namely the *acts* that allegedly constituted sexual battery. In the instant case, by contrast, evidence of Wright's plea was used *simply to prove that the plea happened,* not to prove the factual scenario that precipitated the arrest, charge, and eventual plea.

The "conduct unbecoming" standard in *Canipe* meant that underlying facts were enough to dismiss the teacher. In the instant case, underlying facts are *not* enough; a *legal status* must be proven in order to satisfy the applicable statute. A factual allegation of domestic violence, absent a conviction, guilty plea, or plea of nolo contendere, does not pass muster as an independent reason for denying (or revoking) certification under Tenn.Code Ann. § 38–8–106 or Tenn. Comp. R. & Regs., ch. 1110–2. The POST Commission did

not decertify Wright for "conduct unbecoming a police officer"; it could not have done so, as there is no such ground for decertification.[14] Rather, the commission decertified Wright because he "pleaded guilty to ... [a] violation of ... state law[ ] ... relating to force [or] violence[.]" Tenn.Code Ann. § 38–8–106(4). This statutory basis does not allow for disqualification on the basis of underlying facts alone.

Put another way, the commission decertified Wright not because he allegedly *committed* an *act* of domestic violence, but because he *pleaded guilty* to a *charge* of domestic violence. This is no mere game of wordplay, particularly in light of the fact that Wright denies hitting his ex-wife. If the crux of the dispute had been the *facts* of the underlying assault case, rather than Wright's *legal status*, Wright might have been able to mount a more vigorous defense. He might have brought in witnesses in an attempt to confirm his account of what happened on that fateful day in July 1999. Such testimony would have been relevant because, in such a scenario, the commission would have been called upon to decide *what happened*, rather than to merely decide *what the legal records show*. As things transpired, however, the commissioners regarded the simple fact of Wright's guilty plea, without more, as dispositive of the qualifications issue. All the other evidence they heard, including specific testimony about Wright's conduct, was seen as being relevant only as to the question of whether the commission should, in its discretion, grant a waiver. Yet in truth, under the law, they had no discretion. Wright's case was not properly before the commission in the first place, because his expungement erased from his record the legal fact of his guilty plea, and therefore the issue of waiver should never have arisen because Wright was not disqualified under either Tenn.Code Ann. § 38–8–106(4) or Tenn. Comp. R. & Regs., ch. 1110–2–.03(d). His disqualification, and the resulting discretion of the commission, is dependent entirely upon the existence of the guilty plea as a legally operative fact. Yet legally, an expunged guilty plea under the judicial diversion statute is *not* a legally operative fact. In accordance with *Canipe*, the plea can be used as evidence of underlying facts, but it cannot, by itself, be a reason for legal disqualification, as it was here.

Just as the Supreme Court held in *Lane* that it would be legally erroneous for the trial court to "depend[ ] on the mere fact of conviction (as compared to the underlying conduct)," we hold that both the commission and the trial court erred by depending on the mere fact of Wright's guilty plea (as compared to the underlying conduct). Any other conclusion would eviscerate the plain meaning of the diversion statute. If "[t]he effect of [an expungement] order is to restore the person, in the contemplation of the law, to the status the person occupied before the arrest or indictment or information," Tenn. Code Ann. § 40–35–313(b), then it defies logic to suggest that the person's status with regard to a *guilty plea* is, in the

---

14. There is a qualifications provision requiring that an officer "[h]ave a good moral character as determined by a thorough investigation conducted by the employing agency," Tenn.Code Ann. 38–8–106(8), "and/or the POST Commission," Tenn. Comp. R. & Regs., ch. 1110–2–.03(1)(i). However, there is no such provision in the decertification rule, Tenn. Comp. R. & Regs., ch. 1110–2–.04(2), and in any event, the proceedings against Wright were clearly based on his guilty plea, not on his "moral character." Wright was not given an opportunity to defend his "moral character," as that issue was never raised. Moreover, on all three of his applications for certification, Wright's employers indicated that "[o]ur investigation has determined that this officer is of good moral character."

contemplation of the law, unchanged by expungement.

### C.

■■ The trial court suggested that a different result is warranted because "a police officer occupies a position of public trust," and because Tenn.Code Ann. § 38–8–106(4) "establishes the qualifications for police officers for the protection of the public, not to punish particular applicants." The trial court's opinion cites Tenn. Op. Atty. Gen. No. 00–026, 2000 WL 201993 (February 15, 2000), in support of this proposition. *See also* Tenn. Op. Atty. Gen. No. 04–119, 2004 WL 1698355 (July 20, 2004). Yet both the trial court and the Attorney General are in error on this point. Although it is certainly true that police officers occupy a position of public trust, the state legislature has not chosen to create a police-qualifications exception to the expungement provisions of the judicial diversion statute. The POST rules attempt to create such an exception, but of course, administrative regulations cannot overrule a statute. *See, e.g., Hobbs v. Hobbs*, 27 S.W.3d 900, 903 n. 1 (Tenn.2000) ("any administrative rule … must give way to a statute in express contravention"). The statutory language of Tenn. Code Ann. § 40–35–313 is, we hold, in clear and express contravention of the administrative rule.

The only exceptions to expungement created by the judicial diversion statute allow the limited use of "public records that are defined in § 40–32–101(b)"—to be discussed in more detail momentarily—and "non-public records … solely for the purpose of use by the courts in determining

whether or not, in subsequent proceedings, the person qualifies [for judicial diversion [15]], or for the limited purposes provided in subsections (b) and (c)." Tenn.Code Ann. § 40–35–313(a)(2). Those subsections relate exclusively to civil cases in which the person either "assumes the role of plaintiff in a civil action based upon the same transaction or occurrence as the expunged criminal record," § 40–35–313(b), or is a party witness subject to impeachment, § 40–35–313(c).[16] As can be seen, none of the "non-public records" exceptions are even arguably applicable to this case. Thus, we turn to the § 40–32–101(b) exception.

Tenn.Code Ann. § 40–32–101(b)(1) (Supp.2007) states that expungement does not authorize the court to order the destruction of "arrest histories, investigative reports, intelligence information of law enforcement agencies, or files of district attorneys general that are maintained as confidential records for law enforcement purposes and are not open for inspection by members of the public." The POST Commission emphasizes this provision in its brief, arguing that the existence of this exception suggests that "not only do law enforcement agencies have a need to determine whether an officer meets the statutory standards even when there has been an expungement of public records, there is also a potential means for them to access this information." We disagree, for several reasons. First, we reiterate that a history of "arrest[s]," "investigat[tions]" and/or police "intelligence" about Wright's alleged *conduct* is not sufficient to disqualify him under either the police qualifications statute or the POST rules regarding certifica-

15. As already noted, an individual can only be granted judicial diversion once in Tennessee.

16. Similarly, the statutory provision exempting "false statement[s]" about expunged records from legal penalties applies to answers

"in response to any inquiry made of the person for any purpose," with the sole exception of the above-mentioned situation wherein the person is plaintiff in a civil action.

tion. Only a conviction, a guilty plea, or a plea of nolo contendere will suffice.

Secondly, we are doubtful that POST Commission decertification proceedings qualify as a "law enforcement purpose" under the intended meaning of § 40–32–101. It seems far more likely that the legislature intended this language to refer to actual *police investigations*, not police-related personnel matters that are governed by other statutes. This view is supported by the Supreme Court case of *Memphis Publ'g Co. v. Holt*, 710 S.W.2d 513, 517 (Tenn.1986), which quotes with approval a statement by counsel that "[t]he statute merely acknowledges that the described documents may be maintained by law-enforcement agencies and district attorneys general *for further investigative purposes* after an expungement order is entered." (Emphasis added.) Implicitly, these "further investigative purposes" would be for *police* investigations, not *personnel* investigations by a politically appointed state agency.

Finally and relatedly, we note that a loose construction of the phrase "law enforcement purposes" would threaten to create a broad exception that could nearly swallow the expungement rule by creating a minefield of potential circumstances in which an expunged offense could come back to haunt a defendant. We do not believe that could have been the legislature's intent. Such a result—which is precisely what has happened in this case—directly contravenes the purpose of judicial diversion, which is to "avoid placing the stigma and collateral consequences of a criminal conviction on the defendant [and] to provid[e] the defendant a means to be restored fully and to useful and productive citizenship." *State v. Johnson*, 980 S.W.2d 410, 413 (Tenn.Crim.App.1998). We therefore conclude that the more prudent course is to give the expungement-related

language of § 40–32–101 a narrower construction. This construction is in keeping with the totality of the judicial diversion statute, which delineates a number of very specific exceptions and otherwise sweeps quite broadly in defining the impact of expungement. If the legislature wishes to create an exception to the judicial diversion statute that would allow the POST Commission to consider expunged offenses for purposes of police certification, it is of course free to do so, but it must do so specifically by statute.

We also do not accept the premise that this conflict is a mere clash of statutes between the diversion statute, § 40–35–313, and the police qualifications statute, § 38–8–106. This theory would hold that § 38–8–106's use of the disjunctive form—stating that an officer is disqualified if he has a conviction *or* a guilty plea *or* a plea of nolo contendere—implies a legislative intent to craft an exception for expunged guilty pleas, as these are guilty pleas without convictions. We disagree. As we have already stated, we believe the proper reading of Tenn.Code Ann. § 38–8–106 is that it is silent on the question of whether the commission can consider expunged guilty pleas. The legislature's inclusion of the term "pleaded guilty" does not necessarily imply an intention to include *expunged* guilty pleas under the ambit of the statute, and the mere fact that guilty pleas are listed separately from convictions does not by itself establish this intention. We do not know what the legislature intended when it chose to separately delineate convictions, guilty pleas and pleas of nolo contendere under Tenn.Code Ann. § 38–8–106, but we do know precisely what it intended when it crafted Tenn.Code Ann. § 40–35–313, based on the clear language of that statute. It is a well-settled rule of statutory interpretation that the specific controls the general. *State v. Cauthern*, 967 S.W.2d 726, 735 (Tenn.1998). We will

not disregard the specific language of Tenn.Code Ann. § 40–35–313, which bars any reliance upon expunged offenses for all but a strictly limited list of purposes, on the basis of this exceedingly general language in Tenn.Code Ann. § 38–8–106, which does not even *mention* expungement.

In sum, we conclude that no statutory exception exists that would allow the POST Commission to use a person's expunged criminal history for the purpose of denying or revoking certification, and the POST Commission cannot create such an exception where the legislature has chosen not to do so.

### D.

 We rule that Tenn. Comp. R. & Regs., ch. 1110–2–.03(1)(e)(3) and Tenn. Comp. R. & Regs., ch. 1110–9–.04(1)(c) are in conflict with Tenn.Code Ann. § 40–35–313, and as such, are invalid in any case where that conflict arises.[17] In this case, the result of these rules' invalid application is that Wright was wrongly decertified on the basis of a guilty plea that, at the time of his decertification, was of no legal effect. Both the POST Commission and the trial court made an error of law, and we therefore reverse.

So far as we can tell from the information in this record, Wright is qualified to be a law enforcement officer under Tenn. Code Ann. § 38–8–106, and is fully qualified for certification under Tenn. Comp. R. & Regs., ch. 1110–2–.03, without the need for a waiver or other discretionary action by the commission. The language of the POST Commission rule on certification requirements indicates that, because Wright meets the requirements, he is entitled to certification as a matter of right: "The Commission *shall issue* a certificate of compliance to any person who meets the qualifications for employment and satisfactorily completes a POST certified Basic Law Enforcement Training Academy." Tenn. Comp. R. & Regs., ch. 1110–2–.03(1). Accordingly, we decree that Wright is hereby reinstated as a certified law enforcement officer in the State of Tennessee.

### IV.

The judgment of the trial court is reversed. Costs on appeal are taxed to the appellee, the Tennessee Peace Officer Standards and Training Commission. This case is remanded to the trial court for such further proceedings as may be required to effectuate the decision of this court.

---

17. We do not express any opinion on the validity of the POST rules regarding expungement as applied to *other* statutory expungement provisions in this state or other states. Our ruling's direct applicability is limited to situations where the POST rules conflict with Tennessee's judicial diversion statute, Tenn. Code Ann. § 40–35–313, as that is the only conflict before this court.