2015 S.D. 8

**In the Matter of the Certifiability of Brett JARMAN as a South Dakota Law Enforcement Officer.**

**No. 27115.**

Supreme Court of South Dakota.

Argued Jan. 13, 2015.

Decided Feb. 4, 2015.

Marty J. Jackley, Attorney General, Kelly Marnette, Brent Kempema, Assistant Attorney's General, Pierre, South Dakota, Attorneys for appellee Law Enforcement Officers Standards & Training Commission.

Timothy J. Rensch, Rensch Law Office, Rapid City, South Dakota, Attorneys for appellant Brett Jarman.

SEVERSON, Justice.

[¶ 1.] After a contested hearing, the Law Enforcement Officers Standards and Training Commission (Commission) denied Brett Jarman's application for law enforcement certification. Jarman appealed to the circuit court, which affirmed the Commission's decision. He appeals, asserting

that the Commission improperly based its decision on "expunged conduct." We affirm.

### Background

[¶ 2.] Brett Jarman applied to the Commission for law enforcement certification. He sought a certification of qualification as a candidate for county sheriff. All candidates for sheriff must meet the qualifications provided for law enforcement officers in SDCL 23–3–42, including that of "good moral character[.]" SDCL 23–3–43, SDCL 23–3–43.1. On the application, Jarman acknowledged previous arrests over the years for aggravated assault, simple assault, and disorderly conduct. On February 12, 2014, the executive secretary of the Commission sent a letter to Jarman expressing concerns about Jarman's application and notifying him that the secretary would request a formal hearing before the Commission. The executive secretary expressed concern that Jarman failed to meet the "good moral character" needed for certification due to arrests for aggravated assault in 2010 and domestic violence in 2013. SDCL 23–3–42. Jarman received notice of the contested hearing from the Commission on March 11, 2014, which indicated that the hearing would address the 2010 domestic altercation, as well as the falsification of an employment application to the United States Air Marshall's Service.

[¶ 3.] The Commission held the hearing on March 19, 2014. An attorney conducted the hearing as a hearing examiner, but the Commission was present to hear the case. At the hearing, Jarman's former girlfriend, Walleska Serafin, was the only witness called by the Commission. She testified as to events that happened in August of 2010. Jarman also testified and called two witnesses. Jarman's version of events differed completely from that of Serafin. According to Serafin, she and Jarman started a relationship in 2007. Both have experience in martial arts and met through one of Jarman's martial arts friends. By the time of the incident, they had ended their relationship due, in part, to Serafin moving to Wyoming. However, at Jarman's suggestion, they decided to attend the Sturgis Motorcycle Rally together in 2010. Serafin hoped that they might try a relationship again. After attending the rally, she returned to Jarman's house where she stayed for a few days. On the morning of her planned departure, she told Jarman that she wanted to talk to him before leaving. Jarman told her he had some things to do and left for a few hours.

[¶ 4.] Serafin testified that upon his return, she asked him if they were going to talk soon because she had to leave. Jarman did not respond to her. Instead, he answered a call from someone whom he referred to as "babe." After hearing Jarman call that person "babe," Serafin told him that she needed to know if their relationship would ever work out. Visibly frustrated, he gave her a "chest bump." In response, she began throwing and breaking his valuable figurines. At some point during the altercation, he kicked her leg, too quickly for her to be able to deflect it. She collapsed, thinking that her leg was broken. Despite requests for her phone so she could call for help, Jarman refused to hand it to her. Instead, she had to crawl out to the front yard, after which he finally gave her the phone. She called his son. Although there was a discussion amongst the three about seeking medical help, they decided that because of an impending storm they should return Serafin to Wyoming. They loaded her motorcycle in Jarman's truck, and he drove her home. During the ride to Wyoming, Serafin and Jarman discussed their relationship. Serafin told Jarman that she

was going to tell the medical professionals that he kicked her. Although she would not have been able to drive immediately due to her leg, she could drive by the time they reached Wyoming and sought medical help on her own. She reported at the hospital that the injury was due to an "accident." Her knee required surgery.

[¶ 5.] According to Jarman's testimony, he and Serafin discussed their relationship the night before she was scheduled to leave. He told her that he would need "unobstructed communications" and "non-hostile responses" when they disagree on things. He needed these things due to Serafin's jealous fits. In an attempt to determine who was calling him, she would often grab his phone out of his hand when he was talking to someone. Serafin responded that she needed "unconditional love," packed her motorcycle, and headed west. She returned 45 minutes later. Serafin asked if she could spend the night due to building clouds and impending darkness, and Jarman allowed her to stay. They watched television; Serafin sat on the couch while Jarman sat on the floor.

[¶ 6.] According to Jarman, on the morning of her departure, he was working on a residence across the street. Serafin walked over to the house, and they had another conversation on the street about their relationship, but resolved nothing. After they returned to his house, Jarman began working on his computer and making phone calls while she watched television. When he ended a conversation with "I'll call you back, babe," Serafin flew off the couch and began using crude language to ask if he was having sexual relations with the person who called. He did not respond, instead he walked to the garage so he could charge his cellphone. While he was in there, he heard things hitting the walls. So, he returned to the house where he saw Serafin throwing figurines

and told her to leave. Instead of leaving, she tried to sit down on a 3-D archery target and missed it, hit the corner, and fell on her "rear end," which only added to her anger and caused her to throw additional items. Among the valuable things she threw was a 17th century ivory elephant, but even then Jarman did not react. However, when she reached for one of his swords, throwing something at his face in the process, he moved in to "check" her shoulder and "hook" her arm, causing her to collapse. On the way down, he made sure to hold her head and neck to prevent any injury. At no point did he withhold her phone from her. During their ride back to Wyoming, he stopped to get ice for her injury, and when he got back in the truck, she told him she was going to tell medical personnel that he kicked her. In response, he told her that she needed to tell the truth. He denied kicking her.

[¶ 7.] After hearing testimony from Serafin, Jarman, and two character witnesses, the Commission convened to consider Jarman's application. After deliberation, they determined that Jarman kicked Serafin in the manner she described and he did not meet the minimum qualifications for law enforcement certification due to lack of good moral character. Jarman appealed the Commission's decision to the circuit court arguing, among other things, that it was improper to deny his certification based on a matter which was expunged after an acquittal and that lack of good moral character was not established by clear and convincing evidence. The circuit court affirmed the Commission's decision. Jarman appeals to us raising the following issues:

1. Whether "expunged conduct" may be used to deny law enforcement certification.

2. Whether the Commission's findings were established by a preponderance of the evidence.

## Standard of Review

[¶ 8.] Our review of agency decisions is the same as the review made by the circuit court. *Peterson v. Evangelical Lutheran Good Samaritan Soc'y*, 2012 S.D. 52, ¶ 13, 816 N.W.2d 843, 847. "[W]e perform that review of the agency's findings 'unaided by any presumption that the circuit court's decision was correct.'" *Id.* (quoting *Kermmoade v. Quality Inn*, 2000 S.D. 81, ¶ 10, 612 N.W.2d 583, 586). We "give great weight to the findings made and inferences drawn by an agency on questions of fact." SDCL 1–26–36. We "reverse only when those findings are clearly erroneous in light of the entire record." *Williams v. S.D. Dep't of Agric.*, 2010 S.D. 19, ¶ 5, 779 N.W.2d 397, 400. Questions of law are reviewed de novo. *Id.*

## Analysis

1. *Whether "expunged conduct" may be used to deny law enforcement certification.*

[¶ 9.] Candidates for election as county sheriff must "file . . . a certification of qualification issued by the law enforcement officers standards commission that the candidate meets the qualifications provided in § 23–3–43." SDCL 23–3–43.1. "No person may be elected or appointed as a county sheriff who does not meet the same qualifications provided by § 23–3–42 for the employment of appointed law enforcement officers." SDCL 23–3–43. SDCL 23–3–42 directs the Commission to promulgate rules for the "qualifications for the employment and training of appointed law enforcement officers, including minimum age, education, physical and mental standards, citizenship, good moral character, experience, and such other matters as relate to the competence and reliability of persons to assume and discharge the various responsibilities of law enforcement officers." The Commission adopted administrative rules on the minimum standards for employment as a law enforcement officer. ARSD 2:01:02:01(4) [1] provides that a law enforcement officer must be of good moral character.

[¶ 10.] No rules have been promulgated on whether the Commission may consider

---

1. In full ARSD 2:01:02:01 states:

A person may be employed or certified as a law enforcement officer only if the person meets the following requirements:
(1) Is a citizen of the United States;
(2) Is at least 21 years of age at time of appointment;
(3) Has fingerprints taken by a qualified law enforcement officer;
(4) Is of good moral character;
(5) Is a graduate of an accredited high school or has a high school equivalency certificate acceptable to the commission;
(6) Is examined by a licensed physician who certifies, on forms prescribed by the commission, that the applicant is able to perform the duties of a law enforcement officer;
(7) Is interviewed in person by the hiring agency or its designated representative before employment. The interview must include questions to determine the applicant's general suitability for law enforcement service, appearance, personality, temperament, ability to communicate, and other characteristics reasonably necessary to the performance of the duties of a law enforcement officer;
(8) Takes the oath of office as required by SDCL 9–14–7 or 3–1–5. The oath may be taken before the nearest available judge of a court of record;
(9) Has not unlawfully used any prescribed drug, controlled substance, or marijuana within one year before the time of application for certification;
(10) Is eligible to reapply for certification, if the person has for any reason failed to successfully complete the basic law enforcement training program;
(11) Has not had his certification revoked, voluntarily surrendered certification, had an application for certification refused, or been dismissed from the basic training program, unless the commission upon application declares the person eli-

expunged records. Jarman asserts that "expunged conduct" cannot be used to deny law enforcement certification. He argues that allowing the consideration of such would be an absurd result when candidates cannot even be denied certification solely based on a conviction if they later receive "a reprieve, commutation, or pardon" "based upon a proof of innocence[.]" ARSD 2:01:02:03.01. ARSD 2:01:02:03.01 provides in full:

> Any person ineligible under § 2:01:02:02[2] to be hired or certified as a result of a conviction, may not be denied employment or certification as a result of that conviction if the person, based upon a proof of innocence, received a reprieve, commutation, or pardon. This section does not prohibit the consideration of a conviction or plea in determining moral character under subdivision 2:01:02:01(4).

Jarman asserts that allowing the consideration of any "expunged conduct" would result in more protection for convicted felons than for acquitted individuals.

■ [¶ 11.] Expunged records are distinct from what Jarman describes as "expunged conduct." Jarman repeatedly refers to the domestic incident between himself and Serafin as "expunged conduct." The conduct leading to his arrest and acquittal is not itself expunged. Expungement is:

> the sealing of all records on file within any court, detention or correctional facility, law enforcement agency, criminal justice agency, or Department of Public Safety concerning a person's detection, apprehension, arrest, detention, trial or disposition of an offense within the criminal justice system. Expungement does not imply the physical destruction of records.

SDCL 23A–3–26. Further, "[t]he effect of an order of expungement is to restore the defendant or arrested person, in the contemplation of the law, to the status the person occupied before the person's arrest or indictment or information." SDCL 23A–3–32. An expungement returns the individual to the same legal status they occupied prior to the "arrest or indictment or information" that was expunged. *Id.* It does not however, expunge the underlying facts leading to legal actions. In other words, " 'expungement does not erase the underlying conduct or behavior[.]' " *Wright v. Tenn. Peace Officer Standards & Training Comm'n*, 277 S.W.3d 1, 13 (Tenn.Ct. App.2008) (quoting *State v. Lane*, 3 S.W.3d 456, 462 (Tenn.1999)).

[¶ 12.] Tennessee's statute on the effect of an order of expungement is similar

---

gible for employment or certification; and
(12) Has not become ineligible for employment or certification as a law enforcement officer, as a result of any proceedings involving any revocation, suspension, surrender of, or resignation or dismissal from certification, employment, or training, unless the commission, upon application, declares the person eligible for employment or certification in South Dakota.

2. ARSD 2:01:02:02 states:
No person may be employed or certified if that person has pled guilty or no contest to, or been convicted of, any offense which could have resulted in incarceration for more than one year. Any person who has pled guilty or no contest to, or been convicted of, an offense with a maximum penalty that could have resulted in incarceration of one year or less remains eligible for employment or certification unless the plea or conviction when considered along with the seriousness of the offense, time elapsed since the offense was committed, the person's conduct since the offense was committed, or other pertinent information indicates that the person should not be hired or certified.

to South Dakota's.[3] In *Wright*, a police officer pleaded guilty in a domestic violence case that was dismissed and expunged. The Tennessee Peace Officer Standards and Training Commission decertified him as a result of the guilty plea. *Wright*, 277 S.W.3d at 2.[4] The court addressed earlier case law from the Supreme Court of Tennessee which held that "expungement does not return a person to the position occupied *prior to committing the offense.*" *Id.* at 12 (quoting *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn.1999)). The court explained that there is a "crucial distinction ... between the criminal acts themselves (in the instant case, the act of physical assault) and the *legal status* that results from the legal proceedings precipitated by that criminal act[.]" *Id.* at 12. Further, it explained "the distinction between the *underlying acts,* which are not erased by expungement, and the *legally operative facts* resulting from those acts (such as 'the mere fact of conviction,' or in this case, the mere fact of a guilty plea), which *are* erased by expungement and cannot be considered." *Id.* at 13 (emphasis added).

[¶ 13.] In this case, a jury did not convict Jarman. Jarman argues that an acquittal by a jury of peers means that they rejected Serafin's testimony and determined the incident never happened. The jury's function was to determine whether the prosecution met its burden to prove all the elements of aggravated assault beyond a reasonable doubt. Regardless, we are not confronted with jury findings in this case, only the Commission's findings. Although the jury found Jarman not guilty of aggravated assault, the underlying conduct may still have bearing on Jarman's character. The Commission may properly consider it when determining whether Jarman has the good moral character required. SDCL 23-3-43; ARSD 2:01:02:01(4).

[¶ 14.] Jarman contends that the Commission would need to promulgate a rule that allows the consideration of expunged records for determining good moral character in a similar manner as it has allowed for "consideration of a conviction or plea" as set forth in ARSD 2:01:02:03.01, because " 'the expression of one thing is the exclusion of another.' " *Engelhart v. Kramer*, 1997 S.D. 124, ¶ 18, 570 N.W.2d 550, 554 (quoting *Black's Law Dictionary* 581 (6th ed.1990)). However, as we have noted, the Commission did not base its decision on the expunged records. A witness testified about events that the Commission believed reflected on Jarman's character. That conduct was not found by a jury to be criminal, but the Commission may consider more than criminal convictions when determining if the candidate "is of good moral character."

2. *Whether the Commission's findings were established by a preponderance of the evidence*

 [¶ 15.] The Commission and circuit court used the clear and convincing

---

3. Tenn.Code Ann. § 40-35-313(b) (2014) provides in part: "The effect of the order is to restore the person, in the contemplation of the law, to the status the person occupied before the arrest or indictment or information."

4. The *Wright* court ultimately held against the Tennessee Peace Officer Standards and Training Commission because the commission merely relied on the expunged plea to decertify the officer, rather than the underlying conduct. *Wright*, 277 S.W.3d at 14. The court explained, "[E]vidence of Wright's plea was used *simply to prove that the plea happened,* not to prove the factual scenario that precipitated the arrest, charge, and eventual plea." *Id.* at 13. "[T]he commission decertified Wright not because he allegedly *committed* an *act* of domestic violence, but because he *pleaded guilty* to a *charge* of domestic violence." *Id.* at 14.

standard when determining whether the evidence established that Jarman purposefully kicked Serafin and whether Jarman lacks good moral character. This is not the proper standard for the burden of proof in an agency decision. ARSD 2:01:04:02.01 sets forth the appropriate standard. "Whenever these rules require the showing, proof, finding or other demonstration of any fact upon the application of any person, such showing, proof, finding or other demonstration must be established by a preponderance of the evidence." *Id.*

[¶ 16.] The circuit court cites to our decision in *Kent v. Lyon,* for the increased burden of proof. 1996 S.D. 131, ¶ 15, 555 N.W.2d 106, 110–11. We noted that "we have modified [the] standard of review with respect to professional licenses[.]" *Id.* ¶ 15, 555 N.W.2d at 111. However, that standard of review applies to revocation of licenses, not to the initial determination to grant a license or grant certification. We said:

> [t]he general burden of proof for administrative hearings is preponderance of the evidence. We are inclined to adhere to this general principle with the following exception. In matters concerning *the revocation* of a professional license, we determine that the appropriate standard of proof to be utilized by an agency is clear and convincing evidence.

*Id.* (emphasis added) (quoting *In re Zar,* 434 N.W.2d 598, 602 (S.D.1989)). When we first announced this rule, we wrote: "We set forth this higher standard of proof and limit its application to professional license revocation proceedings because of the importance of the interest involved, i.e., a professional career." *Zar,* 434 N.W.2d at 602. Jarman is seeking certification; he is not having his certification revoked. Therefore, the appropriate evidentiary standard is a preponderance of the evidence.

[¶ 17.] A determination of whether Jarman kicked Serafin and whether he has the requisite good moral character are factual findings which we "give great weight[.]" SDCL 1–26–36. When reviewing agency determinations, we:

> may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Clearly erroneous in light of the entire evidence in the record; or
>
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

[¶ 18.] Jarman challenges the agency's determination—that he kicked Serafin—by pointing out the inconsistency of Serafin's testimony, attacking her credibility, and hypothetically asking why she would accept a ride from him if he had really kicked her. After hearing the parties' testimony, the Commission determined that Jarman kicked Serafin in the manner which she described. Agencies are entitled to make witness credibility determinations and choose between conflicting testimony. *In re Prevention of Significant Deterioration (PSD) Air Quality Permit Application of Hyperion Energy Ctr.,* 2013 S.D. 10, ¶ 41, 826 N.W.2d 649, 661. Further, we have often explained that "we defer to the agency on the credibility of a witness who testified live because the agency is in a better position

[than an appellate court] to evaluate the persuasiveness of witness testimony." *Id.* (quoting *McKibben v. Horton Vehicle Components, Inc.*, 2009 S.D. 47, ¶ 11, 767 N.W.2d 890, 894) (internal quotation marks omitted). Serafin's testimony, as accepted by the Commission and contrasted only by that of Jarman's, is sufficient by a preponderance of evidence to establish that he kicked her.

[¶ 19.] Lastly, Jarman argues that even if the events happened as Serafin described, he was wrongly denied certification on the basis of a lack of good moral character. We do not believe the agency's decision, to deny certification based on the incident, is one which is "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." SDCL 1–26–36. An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Thurman v. CUNA Mut. Ins. Soc'y*, 2013 S.D. 63, ¶ 11, 836 N.W.2d 611, 616. "'An arbitrary or capricious decision is one that is: based on personal, selfish, or fraudulent motives, or on false information, and is characterized by a lack of relevant and competent evidence to support the action taken.'" *Huth v. Beresford Sch. Dist. # 61–2*, 2013 S.D. 39, ¶ 14, 832 N.W.2d 62, 65 (quoting *Hicks v. Gayville–Volin Sch. Dist.*, 2003 S.D. 92, ¶ 11, 668 N.W.2d 69, 73) (internal quotation marks omitted). Law enforcement officers "are expected to uphold the highest standards of conduct." *Green v. City of Sioux Falls*, 2000 S.D. 33, ¶ 22, 607 N.W.2d 43, 49. The Commission's decision—that an individual with a history of using violence in response to an argument lacks the good moral character necessary to be certified as a law enforcement officer—is one within the range of permissible choices.

## Conclusion

[¶ 20.] Although Jarman engaged in conduct a jury determined to be not criminal, and the legal actions taken as a result of the conduct were expunged, the Law Enforcement Officers Standards and Training Commission properly acted within its authority in denying Jarman's certification based on that conduct. We affirm.

[¶ 21.] GILBERTSON, Chief Justice, and ZINTER, and WILBUR, Justices, and KONENKAMP, Retired Justice, concur.

[¶ 22.] KERN, Justice, not having been a member of the Court at the time this action was submitted to the Court, and deeming herself disqualified, did not participate.