2000 SD 33

**Michael GREEN, Grievant and Appellant,**

v.

**CITY OF SIOUX FALLS, Appellee.**

**Nos. 20982, 21000.**

Supreme Court of South Dakota.

Argued Jan. 13, 2000.

Decided March 1, 2000.

Thomas K. Wilka of Hagen, Wilka & Archer, P.C., Sioux Falls, for grievant and appellant.

R. Shawn Tornow, Chief Assistant City Attorney, Sioux Falls, for appellee.

KONENKAMP, Justice

[¶ 1.] Michael D. Green, a Sioux Falls police officer discharged for conduct unbecoming an officer, contends the evidence against him was insufficient to constitute just cause. Based on the findings made by the Civil Service Board, we affirm.

### A.

[¶ 2.] Green began his employment as an officer with the Sioux Falls Police Department in January 1995. He received annual performance evaluations. In 1996, his performance was graded as "above average" or "superior" in every category. His supervisor later described him as an "above average officer and an asset to the department." The 1997 evaluation reported that Green worked well with the public and other officers, but that he did "need to work on some things in the next year" including "more self control when dealing with unruly people." Police Chief Clark L. Quiring hand wrote on Green's 1997 evaluation, "I expect that you will correct these problems by next evaluation."

[¶ 3.] Within six months, two incidents occurred that led to Green's termination. The first happened during his shift on April 24, 1998. Green and another officer responded to a call on an individual believed to be passing forged checks. The suspect was arrested and transported to the Minnehaha Public Safety Building. Green and the other officer led the prisoner, whose hands were cuffed behind his back, to the booking area and had him sit on a bench. Repeatedly the prisoner accused Green of hitting him and splitting his lip.[1] Green turned to argue with him. As the exchange escalated, Green stepped

---

1. The incident report states that the suspect's lip was cut when he became disorderly during the arrest and the officer assisting Green pushed him against a wall. The suspect was charged with resisting arrest.

toward the prisoner. The prisoner stood up. Green shoved him hard against the wall. When the prisoner became more agitated, two other officers stepped in to help secure him with leg irons. While restraining him, Green put his knee on the back of the prisoner's neck and sat on him, a maneuver deemed overly aggressive and not acceptable under departmental procedure.

[¶ 4.] Following an internal investigation, the department concluded that Green acted improperly, exacerbating a verbal confrontation into a physical scuffle with a restrained prisoner. Green was found to have violated departmental Policy § 204.2.C: use of force resulting in or reasonably expected to result in injury to a prisoner. Although the violation could have been considered just cause for discharge, suspension, or reduction, Green was informed he would receive a written reprimand on June 2, 1998.

[¶ 5.] The second incident happened two days later. On June 4, visiting police officers from communities both in and out of South Dakota were attending a DEA sponsored drug enforcement school in Sioux Falls. Green did not attend. But that evening, along with other off-duty Sioux Falls officers, he met the visiting officers for an evening out. Some of the out-of-towners wanted to see a "problem" bar. The group of sixteen officers headed to a place under police scrutiny as a "hot spot" for drug dealing. Nothing significant occurred there.[2] About midnight, they moved on to Suite E, a bar with a dance floor. When they arrived there were only a few customers present. A woman and two men, Lonnie Kannas and Richard Pepper, were dancing in a "triangle formation." When the woman returned to her table, the men continued to dance. Green stepped onto the dance floor along with some of the other officers.

[¶ 6.] According to the allegations against him, to taunt the two men he thought were homosexual, Green danced between them, turned his back to Pepper, and backed up to him bent over at a ninety degree angle in what Kannas later characterized as a "mock anal sex dance." Later, Kannas overheard someone in Green's group say, "Are you going to a fag party or a homo party?" Suite E began closing for the evening. Some of the officers headed for Shenanigans, but "due to a miscommunication," six Sioux Falls officers, including Green, went to Skelly's. With "not much going on" there, they moved on.

[¶ 7.] Out of "curiosity," the six officers chose Touche'z, a "gay bar," for their last stop of the evening. The officers knew that homosexual members of the community patronize this dance club. Coincidentally, Kannas and Pepper, the men Green encountered at Suite E, arrived at the same time. When he saw the group, Kannas went inside to warn the owner "about the possible problems that might be coming through the door."

[¶ 8.] Some of the officers walked into Touche'z carrying open beer bottles. Green had two. One member of the group went to the bar; the rest sat at a table. The owner, Douglas Kooiker, told those at the table that they could not bring in their own beer. According to Kooiker, Green asked if they could still drink them. Kooiker responded that he would have to take their bottles. When he removed them and turned to walk away, Kooiker heard someone at the table exclaim, "Asshole, fucking fags." He identified Green as making the comment because he recognized Green's voice from just having spoken with him. Kooiker disposed of the bottles and returned to say, "It's time for you guys to leave." They immediately complied, getting up and walking toward

---

2. At this bar, the officers were asked by the bartender, who recognized them as police officers, to assist with a fight between a male and a female customer. Instead of getting involved themselves, the officers called 911 to ask for on-duty officers. The male involved in the fight was the same person Green had been involved with in the earlier booking incident.

the door.[3] Kooiker heard Green comment while facing him, "Got kicked out of a fag bar."

[¶ 9.] Once outside, they realized that one of their companions was still inside. Green and another officer went back in. While the other officer searched for the one left behind, Green walked into the game room and picked up a pool cue. In front of the customers, he broke it over his knee, and left the broken pieces on the floor. Kooiker, who had no idea these men were police officers, dialed 911 for emergency assistance. The group left before the police arrived. Kooiker gave the license plate numbers of the vehicles driven by the group to the responding officers, and from that it was learned that Green and the other officers were involved.

[¶ 10.] Following a preliminary inquiry, Green was suspended on June 15, 1998, pending a full investigation. On June 19, Chief Quiring decided that, based on all the circumstances, Green should be discharged. Green appealed to the Civil Service Board. After a hearing on July 9–10, 1998, the Board found just cause for Green's termination. Green's appeal in circuit court was affirmed.

[¶ 11.] On appeal before this Court, Green contends his discharge was based on allegations unfounded or unsupported by "conclusive evidence." We review the Civil Service Board's decision under the Administrative Procedures Act (SDCL 1–26). SDCL 9–14–14. Fact findings will be overturned only if they are "clearly erroneous in light of all the evidence." *Sopko v. C & R Transfer Co., Inc.*, 1998 SD 8, ¶ 6, 575 N.W.2d 225, 228. Questions of law are reviewed de novo. *Id.* By notice of review, the City appeals certain evidentiary rulings made by the Board. As our decision affirms the City's

position, however, we need not reach these nondispositive questions.

### B.

[¶ 12.] Several of the reasons given by Chief Quiring for Green's termination were not borne out in the Civil Service Board's findings. Green believes that the failure of the Board to sustain all the Chief's reasons for firing him make the decision invalid, especially since he contends that most of the remaining reasons accepted by the Board were mistaken. As the Board was the final arbiter in deciding Green's discipline, we examine the Board's findings to ascertain if just cause for termination was established. Sioux Falls Code § 30–45 provides that "[n]o person ... shall be suspended, removed, discharged or reduced from his position, except for just cause[.]"[4] The Board held that just cause existed for the disciplinary action under Sioux Falls Code § 30–46(5):

> The following will be considered as causes for discharge, suspension, or reduction of an officer or employee in the classified civil service, although discharges, suspensions, or reductions may be made for other causes:
>
> (5) Has been guilty of acts constituting ... any conduct unbecoming an officer or employee of the city[.]

[¶ 13.] "Conduct unbecoming an officer" is not defined in the Sioux Falls Code or in any South Dakota statute. The term originates from military law, codified in Article 133, Uniform Code of Military Justice, 10 U.S.C. § 933 ("conduct unbecoming an officer and a gentleman"). In its prevailing usage, conduct unbecoming an officer imports a dual significance. Not only must the behavior be a serious breach of law, morality, or decorum, exposing the offender to personal discredit, but also it must tend to bring dishonor or disrepute

---

3. There were allegations that Green led the group out of the bar, and when he got to the door, he ripped a poster off of the inside of it and forced the door open violently, causing damage to the door and the hinges. The Board did not find that Green was responsible for the damage to the door or the poster.

4. This section is applicable to Green by virtue of Sioux Falls Code § 30–18.

on the offender's profession or organization. *Parker v. Levy,* 417 U.S. 733, 753–54, 94 S.Ct. 2547, 2560, 41 L.Ed.2d 439, 456 (1974) (citing W. Winthrop, Military Law and Precedents 711–712 (2d ed. 1920), as cited in *United States v. Howe,* 17 USCMA 165, 177–178, 37 C.M.R. 429, 441–442, 1967 WL 4286 (1967)). In the military model, service in the armed forces requires obedience, integrity, and adherence to high standards of conduct both in and out of uniform. These standards apply as well to police forces. To maintain both internal discipline and public respect, law enforcement organizations must eliminate behavior reasonably thought to impede proper performance of duties. *See Goldwasser v. Brown,* 417 F.2d 1169, 1176 (D.C.Cir.1969).

[¶ 14.] Other authorities have devised similar definitions for conduct unbecoming, although these definitions are often stated in the disjunctive. For instance, the Arkansas State Police Code of Conduct defines "conduct unbecoming" as including "that which brings the Department into disrespect or reflects discredit upon the employee as a member of the Department, or that which impairs the operations or efficiency of the Department or employee." *Arkansas State Police Comm'n v. Smith,* 338 Ark. 354, 994 S.W.2d 456, 460 (1999) (quoting Arkansas State Police Code of Conduct, General Order 102 § VII A). The term is defined by courts in Pennsylvania as "conduct adversely affect[ing] the morale or efficiency of the police force or tend[ing] to destroy public respect for municipal employees and confidence in the operation of municipal services." *York Township Bd. of Comm'rs v. Batty,* 694 A.2d 395, 397 (1997) (citations omitted). The Wisconsin Court of Appeals defined "conduct unbecoming an officer" as including "that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operations or efficiency of the Department or officer." *Christensen v. City of Racine Police and Fire Comm'n,* No. 94–2061, 1995 WL 440379 (Wis.Ct.App. July 26, 1995).

[¶ 15.] Since we are not as free as lawmakers to fashion broad definitions for official terms, we rely on the time-honored conjunctive definition of conduct unbecoming. The misconduct, although it need not be a crime, must be a serious breach of law, morality, or decorum, exposing the offender to personal discredit, and it must tend to bring dishonor or disrepute on the offender's profession or organization. *Parker,* 417 U.S. at 753–54, 94 S.Ct. at 2560, 41 L.Ed.2d at 456. This formulation discourages extreme discipline for entirely private misbehavior unrelated to job performance. *See Wendell v. South Dakota Dept. of Transp.,* 1998 SD 130 ¶ 8, 587 N.W.2d 595, 597–98 (just cause not established if no nexus between job and acts constituting misdemeanor). Under this two-part definition, we must decide whether sufficient evidence was presented to support the factual findings and legal conclusions of the Board. *Schroeder v. Dept. of Soc. Serv.,* 1996 SD 34, ¶ 4, 545 N.W.2d 223, 226.

### C.

[¶ 16.] In reviewing the findings, we are in no position to judge witness credibility, a matter better left to those who preside firsthand. *See Petersen v. Hinky Dinky,* 515 N.W.2d 226, 235 (S.D. 1994) (citing *Wendel v. Domestic Seed & Supply,* 446 N.W.2d 265, 271 (S.D.1989)). At this level, we study the record to determine whether the findings can be sustained as not clearly erroneous. *Id.* at 231. The Civil Service Board heard conflicting versions of events on June 4: one from Green and his fellow officers, and another from members of the public. Five Sioux Falls police officers present with Green on the evening of June 4 appeared on Green's behalf at the Board hearing. All these officers said that no lewd dancing took place. Kannas, on the other hand, said that Green danced in a sexually suggestive, mocking fashion. The officers tes-

tified that they heard no derogatory remarks from Green; indeed, they heard no anti-gay comments from anyone. Yet other testimony at the hearing persuaded the Board to find to the contrary. Three of the testifying officers had faced disciplinary action themselves for their participation in events that evening. Those three revealed that they were appealing the discipline they received.

[¶ 17.] Green's actions in the booking room were taken into account in the Board's decision. It found that Green escalated a confrontation, obliging the officers to take the prisoner to the ground and use leg irons to secure him. A video camera in the booking area recorded the incident and the videotape was shown to the Board at the hearing. It displays a mouthy, accusatory subject with his hands cuffed behind his back. Chief Quiring explained as the tape was playing that Green was inappropriately restraining the prisoner. Although Green disputes where his knee was positioned, the Board found that "Green restrained [the prisoner] by putting his knee on the back of [the prisoner's] neck as he 'sat' on top of him." In our viewing of the tape, though it is difficult to see exactly where his knee was, we cannot say the Board's conclusion was wrong. Green's unnecessary and unprovoked shove of the prisoner, however, is irrefutable.

[¶ 18.] Still, there were troubling inconsistencies in the evidence against Green on the June 4 incident. Kooiker's testimony, for example, that he knew Green uttered the anti-gay remark even though his back was turned was seriously challenged. Kooiker said he recognized Green's voice after having spoken with him at the table. Yet, another officer, Tom Krull, testified that it was he who spoke with Kooiker at that time, not Green. Furthermore, the witnesses who testified against Green before the Board were more certain in their identification of Green as the originator of the anti-gay comments than they were when first interviewed. In Green's view,

talk of lawsuits against the City and rising sentiment against him in some quarters of the community firmed up and embellished witness memories.

[¶ 19.] Green admitted he brought beer into Touche'z. He also admitted he broke a pool cue over his knee: "I don't know why I did it. It was stupid." But the Board also found that Green was dishonest during the internal police investigation. Chief Quiring told the Board that when he reviewed the tapes and reports made during the investigation, he concluded that Green was not being honest. Quiring testified that there were witnesses claiming Green used derogatory language and that he broke Touche'z door, but that the only thing Green would admit to was breaking the pool cue. Given that the Board found Green used derogatory language and engaged in unwholesome dancing, both of which he denied, it follows that the Board would also find he had been dishonest.

[¶ 20.] Even if doubt favors Green's version of events, breaking the pool cue at Touche'z reveals something of his attitude about a gay bar and its patrons. This hostile act gave credence to the intolerant remarks attributed to him. If actions signify more than words, this was an open gesture of antagonism. Although there was conflicting testimony on the events of June 4, the record contains sufficient evidence, if believed, to support the Board's findings. The Board was in the best position to decide credibility. Accordingly, Green has not met his burden of showing that the findings were clearly erroneous.

### D.

■■■ [¶ 21.] Having resolved that the evidence supports the findings, our review turns to whether the findings support the conclusion that just cause existed for termination. Just cause is fully reviewable as a legal question. *City of Sioux Falls v. Miller*, 1996 SD 132, ¶ 12, 555 N.W.2d 368, 371 (citation omitted). Did Green's acts establish conduct unbecoming an officer? A single occurrence taken in isolation may

not have been sufficient to justify termination. The incident in the jail was obviously not enough in the opinion of the Police Chief, as Green was to receive only a formal reprimand. Yet in the City's progressive discipline process that incident could be considered together with what happened on June 4. Carrying an open bottle into a bar may be a minor infraction, but the lewd dancing, offensive remarks, and destruction of property are more serious. The Board properly considered these circumstances in their totality.

[¶ 22.] In reviewing a finding of conduct unbecoming, we look first at the personal aspect. Green's behavior in taunting members of the public by acts and words, in abusing a prisoner, in damaging private property, all discredit him. Green argues that whatever he may have done on June 4 while off-duty should not reflect on his job performance. Yet, the laws he broke while off-duty were the same laws he swore to enforce while on-duty. Police are expected to uphold the highest standards of conduct. *Batty*, 694 A.2d at 397 (citation omitted). Law enforcement officers, whether on or off duty, live under the public view. An officer's image is vital to the police mission. *Eilers v. Civil Serv. Comm'n of City of Burlington*, 544 N.W.2d 463, 466 (Iowa Ct.App.1995) (citation omitted). Can anyone reasonably trust that an officer who harasses minorities by night will ungrudgingly protect their lives and property by day? Green's conduct is particularly troublesome in that it took place in the area of Sioux Falls where he patrolled as an officer.

[¶ 23.] Lastly, we decide if the conduct tends to bring dishonor or disrepute on the profession or organization. Conduct unbecoming a law enforcement officer undermines the rightful expectation of the public to a professional police force. Police are duty-bound to enforce the law evenly, without bias and without favor. If intolerance and aggression are accepted, that attitude may permeate other aspects of the criminal justice system. In the exercise of their duties, there can be no "second-class citizens" in the eyes of peace officers. All people are entitled to impartial treatment. Green's reprehensible conduct, committed in a public place, diminishes community confidence in police impartiality and public respect for the quality of law enforcement. *Kleinsasser v. City of Rapid City*, 440 N.W.2d 734, 737 (S.D.1989). We discern no error in the Board's finding of just cause and its decision to terminate Green's employment.

[¶ 24.] Affirmed.

[¶ 25.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.