#25812-a-JKK

**2011 S.D. 41**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

TIMOTHY FARMER,                                            Appellant,

    v.

CITY OF RAPID CITY and
RAPID CITY POLICE
DEPARTMENT,                                            Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JANINE KERN
Judge

\* \* \* \*

COURTNEY R. CLAYBORNE of
Clayborne, Loos & Sabers, LLP
Rapid City, South Dakota                    Attorney for appellant.

JASON E. GREEN
City Attorney
City of Rapid City
Rapid City, South Dakota                    Attorney for appellees.

\* \* \* \*

ARGUED ON MAY 24, 2011

OPINION FILED **07/20/11**

#25812

KONENKAMP, Justice

[¶1.]     The Rapid City Police Department fired a patrol officer for excessive use of force. On appeal, the officer contends that he never acted beyond the Department's use of force continuum policy. But the question comes down to whether the officer's own actions generated his claimed need to use force. Considering both the subject incident along with the officer's disciplinary record, we conclude that there were sufficient grounds to support the officer's discharge.

**Background**

[¶2.]     The Rapid City Police Department hired Officer Timothy Farmer on August 1, 2005. As a patrol officer, Farmer made routine traffic stops, patrolled designated sectors and neighborhoods, investigated crimes, and took suspects into custody. In early 2009, though he had prior disciplinary issues, the Department promoted Farmer to training officer.

[¶3.]     On Sunday, March 8, 2009, Farmer was working the north central sector of Rapid City. At 4:45 a.m. he was dispatched to investigate an aggravated assault at the Golden Living Center, an assisted living facility on North 7th Street. On arriving, Farmer saw a nurse standing in front of the building and a woman lying on the ground. The woman was later identified as Wilma Leach, the victim of the aggravated assault. In talking with Leach and the nurse, Farmer learned that Leach was assaulted with a pipe by two males and a female. The nurse last saw the suspects running north. Farmer called for an ambulance.

[¶4.]     Within the next five minutes, another dispatch message relayed that a gang fight was taking place nearby on Galaxy Drive involving males and a black

SUV. Farmer believed the newly reported incident was related to the Leach assault. He left the Golden Living Center and Leach to respond to the gang fight.

[¶5.] Farmer's in-car video camera recorded much of what happened next. When he arrived near the location of the reported gang fight, he saw a light-colored car pull into a paved parking area. Farmer activated his lights and siren and pulled up behind the car. Two women, Martina Martinez and Bryanna Bear, exited the vehicle and quickly walked away, each taking a different route into a housing complex. Farmer believed the women were involved in the assault. He exited his vehicle and yelled at Bear and Martinez, "Get on the ground right now!" Neither woman complied. Farmer ran toward Bear, saying again, "Get on the ground." Bear can be heard saying in a shrill voice, "Me? Why?" Farmer grabbed her by the arm, using a "soft empty hand technique" in the Department's use of force continuum policy. When Martinez saw Farmer detain Bear, she turned back and approached Farmer. Farmer told Martinez, "You better back up, Ma'am." Martinez shouted, "No, you better fucking back up, that's my daughter." Believing Martinez now posed a greater threat, Farmer let go of Bear, and grabbed Martinez, still using a "soft empty hand technique." He took hold of her arm, forced her onto the hood of her car, and told her to place her hands on the car. Farmer called for a backup officer. All the while, Bear was yelling at Farmer insisting they did nothing wrong. Martinez told Bear to run away to her uncle's house, and Bear headed east, out of sight of the camera.

[¶6.] Officer Sean Doyle arrived. According to Farmer, he motioned for Doyle to take control of Martinez so he could apprehend Bear. Farmer then let go of

Martinez and ran after Bear. Once free of Farmer's restraint, Martinez can be seen getting into her car and retrieving something. Later it was learned she had grabbed her cell phone. Then she ran in the direction of Farmer and Bear. Now, everyone involved was out of view of Farmer's in-vehicle camera. Nonetheless, Martinez can be heard calling 911 for help, reporting that she and her daughter were being assaulted by a police officer. Ultimately, Farmer apprehended Martinez by taking her to the ground and handcuffing her, using a "hard empty hand technique." Martinez was arrested and charged with obstruction, but the charge was later dropped. Bear was also restrained, but was not cited for any infraction. As a later investigation revealed, Martinez was at the scene to pick up her son, who had called her reporting a fight.

[¶7.] Shortly after the incident, Martinez filed an excessive force complaint with the Rapid City Police Department. Sergeant Cliff Peterson interviewed Martinez. He also spoke with Farmer and Doyle. The Department then assigned Lieutenant Tom Vlieger to conduct an investigation, and Farmer was placed on administrative leave.

[¶8.] As part of his investigation, Vlieger interviewed Bear and Farmer, and reviewed the interviews conducted by Sergeant Peterson. He also watched the video of the incident, listened to Martinez's 911 call, and played the recorded radio transmissions from that morning. Vlieger concluded that "[t]he allegation of excessive force during the arrest of Martina Martinez is substantiated." He thought that "Farmer's judgment [was] questionable in this incident." Vlieger noted that Farmer stopped a vehicle that was not fleeing, but was arriving at the alleged gang-

fight scene, and contained female, not male, occupants. He concluded that "nothing in the video . . . justifies [Farmer's] immediate response with the level of force used." In Vlieger's opinion, instead of ordering them to get on the ground, Farmer "could simply have told them to stop so he could talk to them." Vlieger believed that Farmer looked "confused as to what he should do throughout the incident[.]" He wrote, "It appears he cannot make a decision about which of the two individuals he should be arresting as he goes back and forth from one to the other without ever completing an arrest on either." Finally, Vlieger questioned Farmer's decision to respond to the misdemeanor gang-fight call, considering that he was on a "felony aggravated assault call" with the victim. Vlieger recommended that the Department discipline Farmer by (1) removing his training officer status, (2) requiring a fit for duty examination, (3) removing him from the night shift and north sector, and (4) suspending him from duty without pay.

[¶9.]        Vlieger's memo and recommendations were sent to Captain Doug Thrash. Following his review, Thrash issued a memorandum concluding that "[t]he Rapid City Police Department has determined that [Farmer] engaged in conduct that was detrimental to the department on 3-8-09." Thrash identified three specific issues. First, he questioned Farmer's judgment because Farmer "left a call that involved an aggravated assault to respond to a fight call knowing there was another officer in the area who was on a traffic stop that could have responded." Second, Thrash addressed Farmer's tactics: "nothing justifies [Farmer's] level of force used" when yelling commands at Bear and Martinez to get on the ground. Also, by restraining Bear, but letting her go to restrain Martinez, then letting Martinez go to

run after Bear, Farmer allowed Martinez to get into her vehicle. And the release of Martinez obliged Farmer to use a higher level of force to restrain her a second time, which led Thrash to conclude that "[t]he force [Farmer] used to subdue [Martinez] was clearly excessive." Third, Thrash questioned Farmer's credibility, concluding that Farmer's "report [of the incident] demonstrates embellishment of either [his] perception of [Martinez's] movements or efforts to justify the force used."

[¶10.] In addition to the March 8, 2009 incident, Thrash reviewed Farmer's personnel record. Farmer had received six formal complaints in his last three and a half years with the Department, three with substantiated use of force issues and one for unprofessional behavior. In one instance, Farmer received a letter of reprimand for using "unnecessary" force two years earlier in his handling of Michael Slow Bear, a man in custody who was being booked into jail. Regarding this incident, in a memorandum prepared by Lieutenant Dave Stratton, Farmer was warned: "I trust you have learned from this experience and caution you that similar incidents in the future could result in more severe disciplinary action." Considering Farmer's record, Thrash concluded that Farmer's behaviors will likely be repeated, as he "demonstrates resistance or inability to change." Thus, Thrash decided that Farmer should be discharged immediately.

[¶11.] Under the City of Rapid City's collective bargaining agreement with the Fraternal Order of Police, Farmer was entitled to an informal hearing "within seven days of [his] discharge," at which "he may offer evidence and arguments." Farmer was represented by counsel for this hearing. Thereafter, Chief of Police Steve Allender issued a letter to Farmer. Allender noted that Martinez's vehicle did

not match the black SUV suspected in the gang fight, Martinez and Bear were approaching, not leaving, the gang-fight crime area, and Farmer did not have Leach identify Martinez or Bear as possible suspects in the assault at any time after Martinez's arrest.

[¶12.] Allender thought that Farmer "used poor judgment in deciding to stop a vehicle based on the possible involvement with the gang fight." In Allender's judgment, Farmer "acted unreasonably in his attempt to detain [Martinez and Bear,] and made unreasonable demands of them." Allender wrote that "the detention and arrest of Martinez" appeared "technically justified," but "it is more appropriately considered to be unnecessary and unfortunate." In regard to Farmer's personnel record, Allender observed that in Farmer's last thirty-six months of service he had been the subject of six formal complaints for excessive force and three informal complaints, one for excessive force, one for failing to take a report, and one for improper stop of a vehicle. Allender noted that "the total number of complaints against Farmer is unprecedented[.]" Allender also considered Farmer's recent promotion to police training officer, commenting that "[m]anagement had reason to believe his behavior had changed[.]" However, the most recent incident led Allender to conclude that "the department's efforts to change Farmer's behavior have been ineffective, since the pattern has been repeated." This incident, Allender wrote, marks "the third time in three years [Farmer] will be disciplined for unprofessional conduct[.]" Allender continued: "It is also apparent he believes he did nothing improper in this case so certainly we should expect this type of behavior in the future." He concluded, "Farmer poses a

risk to the integrity of the department, its relationship with the community as a whole and to the next individual person he may subject to the use of force because of a misperceived threat." Thus, "[b]ased on his actions in this incident, coupled with his disciplinary history," Farmer's employment was terminated on May 6, 2009. An appeal to the Mayor of Rapid City was unsuccessful.

[¶13.] Farmer then appealed to the Department of Labor. Following a hearing, the Department of Labor issued findings of fact and conclusions of law and an order upholding the Police Department's decision. It ruled that Farmer "employed unnecessary force and excessive force when dealing with Martinez" in violation of the Police Department's use of force rules and code of ethics. Taking into account Farmer's history, specifically the Slow Bear incident, which resulted in a letter of reprimand in Farmer's personnel file, the Department of Labor held that Farmer brought discredit upon the Police Department, and thus sufficient cause existed to end his employment.

[¶14.] In circuit court, Farmer's appeal was affirmed. The court found "ample evidence" to support the discharge. According to the court, the video evidence substantiated the claim that Farmer used excessive force. The court ruled that Farmer technically complied with the use of force policy, but noted that "it was his actions, not those of Martinez and Bear that escalated the situation. But for [Farmer's] decision to immediately yell at the women to 'Get on the ground,' and his subsequent wrangling with them, the level of force used would have been much lower."

## Analysis and Decision

[¶15.] On appeal before this Court, Farmer argues that there was no "just cause," as required in the collective bargaining agreement, to support his discharge because no witness could "articulate any specific violation" he committed. In his view, the evidence fails to establish that he used excessive force on March 8, 2009. Rather, he asserts that the Police Department discharged him using hindsight to measure excessive force. He further claims that the Department "undertook an impromptu referendum on his police career" and "re-categorized their cause for the termination" to be his bad judgment, instead of proving a violation of the use of force policy. In sum, Farmer contends that he "appropriately followed the use of force continuum, thus making it impossible for the City to substantiate the excessive force allegation."

[¶16.] The collective bargaining agreement provides that the "City has the right to impose discipline upon employees for violations of the City's work rules or for conduct that is detrimental to the Department or the City." Under the agreement, "[d]iscipline may include discharge of an employee." But the "City shall only impose discipline for cause." "Cause" is not specifically defined in the bargaining agreement. Farmer seeks to apply outside authorities to interpret whether there was cause in this case. This we need not do because, based on the words of the collective bargaining agreement, cause for discipline exists if there is sufficient evidence that Farmer violated the City's work rules or acted detrimentally to the Department.

[¶17.]    Here, the Police Department, through Captain Thrash, notified Farmer that his job was being terminated because he "engaged in conduct that was detrimental to the department on 3-8-09." Police Chief Allender reached the same conclusion. Farmer dismisses this reason and asks this Court to focus on whether the Department established that he violated the use of force policy, because Martinez complained that Farmer used excessive force. But nothing in the collective bargaining agreement limits the Police Department's review of a disciplinary incident to solely how the incident was characterized by a citizen complainant. Appropriately, the Department examined the episode as a whole, assessing Farmer's judgment, tactics, credibility, and personnel history. Accordingly, we examine whether, under the totality of circumstances, there was sufficient evidence to support Farmer's discharge for conduct detrimental to the Department.

[¶18.]    The Department of Labor found that Officer Farmer "employed unnecessary and excessive force" against Martinez in violation of the Police Department rules on use of force, and that "his actions in this matter and in the previous instances where discipline has been imposed [brought] discredit upon" the Police Department. We review the Department of Labor's findings of fact for clear error, and conclusions of law de novo. *Green v. City of Sioux Falls*, 2000 S.D. 33, ¶ 11,  607 N.W.2d 43, 46 (citations omitted). Whether cause existed for termination is a legal question, and therefore, fully reviewable. *Id.* ¶ 21 (citing *City of Sioux Falls v. Miller*, 1996 S.D. 132, ¶ 12, 555 N.W.2d 368, 371). From our review of the record, we have no reason to declare those factual findings clearly erroneous. In the video,

Farmer can be seen pulling into the parking area behind Bear and Martinez, rushing out of his vehicle, immediately yelling at them to, "Get on the ground right now," and then seizing each woman in turn. There was no indication that Bear or Martinez were involved in any criminal wrongdoing before Farmer encountered them. Nothing in Farmer's explanation or in the record warranted such aggression. Worse, by first controlling Martinez with soft empty hand techniques and then letting her go, he was required to use a greater degree of force to gain control of her the second time.

[¶19.]      Farmer's decision to leave the victim of the aggravated assault to pursue the gang fight also impugns his judgment. While he claims his reasoning was justified, as he thought the call was related to the assault, the record supports the finding that Farmer exercised poor judgment when pursuing the gang-fight call instead of staying with Leach. The dispatch call on the gang fight detailed a situation involving males and a black SUV. The assault against Leach was by two men and one woman, who left the scene on foot. When he encountered Bear and Martinez, they were not on foot, were clearly female, and were in a light-colored vehicle. Logically, when police officers fail to use good judgment, they bring discredit upon law enforcement.

[¶20.]      Also damaging to his position was Farmer's record of disciplinary incidents. As Chief of Police Allender explained: "The most recent complaint makes the third complaint resulting in disciplinary action against Farmer in as many years." The complaints against Farmer were, in Allender's words, "unprecedented." Thus, the Department was faced with the question whether Farmer's past conduct

forecast his likely future conduct as a police officer. In regard to the Slow Bear incident, the Department of Labor found that "without any physical provocation by Slow Bear, [Farmer grabbed] Slow Bear and [pulled] him off the chair, driving Slow Bear's head into the wall opposite the chair." Farmer argues that it "was unfair for the Department to reopen the Slow Bear incident to justify" his discharge by "retrospectively creat[ing] 'just cause.'" But the Police Department would have been remiss in not considering Farmer's disciplinary record when assessing whether it should continue his employment. Indeed, Farmer had been warned after the Slow Bear incident that "similar incidents in the future could result in more severe disciplinary action."

[¶21.] Since the Department of Labor and circuit court findings are supported by the record, our remaining task is to determine whether those findings establish cause to discharge Farmer. *See Green*, 2000 S.D. 33, ¶ 21, 607 N.W.2d at 48. The question is whether Farmer's conduct was detrimental to the Police Department or violated departmental work rules as stated in the collective bargaining agreement. Effective police work often demands immediate action, and in hindsight that action may later be called into question unfairly. A single error of overreaction, depending on the gravity of that error, may not justify discharging a police officer. But this is not a case of a single mistake. The events of March 8 were a series of errors. Leaving the victim of a felony assault, pursuing a gang fight another officer could have covered, rushing after Martinez and Bear, yelling for them to get on the ground, subduing and then releasing each woman to pursue the other — Officer Farmer overreacted at every turn.

[¶22.] Yet even if we were to conclude that the events of March 8 amounted to nothing more than one cumulative error, a misjudgment compounded, we must still reckon with Officer Farmer's disciplinary history. Police officers "are expected to uphold the highest standards of conduct." *Id.* ¶ 22. To be effective, they must use good judgment, employ restraint, and necessary compassion. *See Eilers v. Civil Serv. Comm'n of City of Burlington*, 544 N.W.2d 463, 466 (Iowa Ct. App. 1995). Officer Farmer had an "unprecedented" record of complaints, with three disciplinary actions for unprofessional conduct in three years. Taken together, his actions on March 8 and his disciplinary history established, as Allender opined, that "Farmer pose[d] a risk to the integrity of the Department, its relationship with the community as a whole and to the next individual person he may subject to the use of force because of a misperceived threat." Sufficient cause existed to discharge Officer Farmer.

[¶23.] Affirmed.

[¶24.] GILBERTSON, Chief Justice, and ZINTER and SEVERSON, Justices, and MEIERHENRY, Retired Justice, concur.